❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No. 23-895M(NJ) |
| Two cellular telephone number 414-574-6830 | ) |
| and 414-797-9975 stored at premises | ) |
| controlled by T-Mobile. | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before 5/3/2023_____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.   xx❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon Nancy Joseph_____.
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____.

Date and time issued: 4/19/2023 @ 9:41 a.m._____

*Judge's signature*

City and state:   Milwaukee, WI_____          Hon. Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

Records and information associated with the cellular telephone assigned call number **414-574-6830** and the cellular telephone assigned call number **414-797-9975** (referred to in attachment B as "the Accounts"), that is stored at the premises controlled by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

# ATTACHMENT B

## Particular Things to be Seized

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Accounts listed in Attachment A for the following dates: November 1, 2022, at 12:00 a.m. (CST) through December 16, 2022 at 11:59 p.m. (CST):

A.      The following information about the customers or subscribers of the Accounts:

1.      Names (including subscriber names, user names, and screen names);

2.      Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

3.      Local and long-distance telephone connection records;

4.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

5.      Length of service (including start date) and types of service utilized;

6.      Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity

18

Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

7.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

8.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

B.   All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Accounts, including:

1.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

2.   information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received, as well as per-call measurement data.

3.   per call measurement and timing advance data (PCMD, RTT, True Call, NELOS, or similar)

## II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 18, United States Code and Sections 922(g)(1) (felon in possession of a firearm) and 1951(a) (Hobbs Act robbery), involving DEVON BRANTLEY, during the period of November 1, 2022, at 12:00 a.m. (CST) through December 16, 2022 at 11:59 p.m. (CST).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts

19

under government control) are authorized to review the records produced by the Service

Provider to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Two cellular telephone number 414-574-6830 and<br>414-797-9975 stored at premises controlled by<br>T-Mobile. | )<br>)<br>)<br>)<br>)<br>)     Case No. 23-895M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the     Eastern     District of     Wisconsin     , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 19 U.S.C. Sections 922(g)(1)<br>and 1951(a) | Felon in possesion of a firearm and Hobbs Act Robbery |

The application is based on these facts:

See Attached Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of \_\_\_\_\_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

 

*Applicant's signature*

Special Agent Heather Wright, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by     telephone     *(specify reliable electronic means)*.

Date: 4/19/2023 @ 9:45 a.m.

*Judge's signature*

City and state:  Mlwauee, WI

Hon. Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

I, Heather Wright, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION, BACKGROUND, TRAINING, AND EXPERIENCE**

1.      I make this affidavit in support of an application for a search warrant for information associated with a two cellular telephones' assigned call numbers.

   a.   Information associated with call number **(414) 574-6830** ("**Target Phone #1**") stored at a premises controlled by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

   b.   Information associated with call number **(414) 797-9975** ("**Target Phone #2**") stored at a premises controlled by T-Mobile, a wireless telephone service provider headquartered at T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

2.      T-Mobile will be referred to as the "Service Provider." The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require the Service Provider to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since July of 2010. Since August of 2020, I have been assigned to the FBI's

1

Milwaukee Area Violent Crimes Task Force, a multi-jurisdictional law enforcement entity charged with investigating violations of federal law, including bank robberies, commercial robberies, armed motor vehicle robberies, illegal possession of firearms, drug trafficking offenses, and other violent crimes. I have been trained in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. I have participated in criminal investigations, surveillance, search warrants, interviews, and debriefs of arrested subjects. As a result of this training and investigative experience, I have learned how and why violent actors typically conduct various aspects of their criminal activities.

4.      Based upon my training and experience, I know that criminal investigations have been aided by subpoenas, warrants, and court orders related to electronic communication records by providing critical investigative leads and corroborative evidence.

5.      To this end, based upon my training and experience, I know that individuals involved in firearms-related and violent crimes use cellular telephones to maintain contact with co-conspirators aurally or via electronic message in "text" format. I also know that it is common for suspects who commit firearms-related and violent crimes to take, or cause to be taken, photographs and other visual depictions of themselves, their associates, and the illegal proceeds and firearms that they control or possess.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other Agents, law enforcement personnel

2

and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that DEVON R. BRANTLEY (dob: XX/XX/1998) and other known or unknown co-conspirators committed violations of Title 18, United States Code and Sections 922(g)(1) (felon in possession of a firearm) and 1951(a) (Hobbs Act robbery). I further submit that there is probable cause to believe that evidence of BRANTLEY's, and others' involvement in the robbery will be recovered in the records that are sought herein.

## PROBABLE CAUSE

*Shooting One*

8.     On November 7, 2022, a witness, hereinafter L.C., walked into MPD District 4 to report a shooting. L.C. stated that he was a bus driver for Quad Graphics, and that he transported DEVON BRANTLEY and his brother JAVON BRANTLEY to their place of employment, Quad Graphics, located in Hatley, WI, on a regular basis. L.C. stated that on that day, he picked up BRANTLEY and JAVON at approximately 6:40 a.m. near N. 27th Street and W. Hope Avenue and stopped at a Mobile gas station located 2620 W. Capital Drive to pick up some water for himself. When he exited the gas station, he observed both BRANTLEY and JAVON standing outside the bus. L.C. observed that BRANTLEY was holding a black handgun and was pointing it at JAVON. BRANTLEY and JAVON continued to argue and BRANTLEY fired (5) shots in the direction of

JAVON. BRANTLEY then fled on foot. JAVON then got back into the bus and L.C. and JAVON drove to a police station. L.C. stated that just before arriving at the District, JAVON fled the bus on foot. One round passed through the bus, leaving a bullet hole. At approximately 6:44 p.m., MPD Officers obtained (5) brass 9mm spent casings from the parking lot of the Mobile gas station.

*Shooting Two*

9.      On November 30, 2022, at approximately 12:45 p.m., MPD Officers responded to Froedtert Hospital regarding a shooting victim. The victim, hereinafter S.G., stated that she was in the area of 35th and Silver Spring walking northbound on 41st or 42nd Street towards W. Silver Spring Dr., in the middle of the street, when she walked past a black car with tinted windows. S.G. stated that she did not look inside the car as she walked past but knew there were people inside because she heard movement and people talking. S.G. stated that when she was approximately three car lengths past the vehicle, she heard a male say "hey!". S.G. stated that when she turned around, she observed a black male, approximately 5'1", older based on his voice, thin build, point a black semi-automatic handgun at her and fire approximately four to five times in her direction. S.G. stated that she immediately knew that she had been shot in the calf and ran and hid in a yard nearby. S.G. stated that she removed the black coat that she had been wearing. S.G. stated that she observed the vehicle with the windows down slowly driving in the area and appeared to be looking for her. S.G. stated that she walked to the bus stop, took the bus to her brother's house, where her brother called 911. The victim appeared to be intoxicated at the time she reported the incident.

4

10.    Following the incident, at approximately 1:10 p.m., two United States Probation Officers, Daniel Zander and Kristina Langteau, walked into MPD District 4 to report being a witness to a potentially related incident. On November 30, 2022. Probation Officers Zander and Langteau had a scheduled home visit at 5409 N. 41st Street at 11 a.m. The home visit was scheduled with Michael Garner, DOB XX/XX/1992. Probation Officers Zander and Langteau arrived just prior to 11:00 a.m. at 5409 N. 41st Street. While walking up to the residence, Zander and Langteau observed a black Chevrolet Malibu parked in front of the residence. Although the vehicle had dark tinted windows, the driver of the vehicle rolled down the front passenger side window and spoke with the Officers. Officers Zander and Langteau recognized the driver of the vehicle to be BRANTLEY – as they have also supervised BRANTLEY since his release from custody. Officers Zander and Langteau were aware that BRANTLEY was the brother of Garner. Officers Zander and Langteau also knew that BRANTLEY also lived at 5409 N. 41st Street. Officers Zander and Langteau briefly spoke with BRANTLEY and told BRANTLEY that following their visit with GARNER, they would be speaking with BRANTLEY. They had been unable to locate him since the Quad Graphics bus shooting incident and were surprised to find him outside the 5409 N. 41st Street home.

11.    Probation officers Zander and Langteau were inside of 5409 N. 41st Street for approximately 10 minutes when they heard approximately (4) gunshots coming from outside the front of the residence. After waiting approximately (1) minute, Officers Zander and Langteau looked out a window to the front of the house and observed the

Chevrolet Malibu that they had observed being driven by BRANTLEY pull away from the curb.

12.     Approximately (2) minutes later, Probation Officers Zander and Langteau exited the residence and checked the area where they saw the vehicle parked. Probation Officers Zander and Langteau observed (4) 9mm spent casings in the street where the vehicle had been parked. Probation Officer Zander photographed and video recorded the locations of the fired casings in the street and then recovered the casings using their work-issued evidence recovery implements. Probation Officers Zander and Langteau then traveled to District 4 to report the incident.

*Shooting Three*

13.     On December 14, 2022, at 7:10 p.m., MPD officers responded to the Dominos Pizza located at 6918 N. Teutonia Avenue, Milwaukee, Wisconsin for an armed robbery complaint. The caller stated that two males entered the business and attempted to rob them. The caller added that the subject fired multiple gunshots inside the building prior to leaving the scene. There were three victims associated with this incident. These victims will be referred to by their initials, A.J., D.L., and S.M., throughout this affidavit.

14.     A.J. stated that at approximately 7:04 p.m., A.J. was on duty and standing near the front counter folding pizza boxes, when two black males entered the lobby armed with semi-automatic handguns. A.J. stated that one of the males approached the front counter and pointed his handgun, with an extended magazine, at her and told her to "Come here." A. J. stated that she replied, "Do you know me?" A.J. stated that she refused to walk towards the counter, so Suspect 1 stated "Oh, you think I'm playing?"

6

A.J. stated that the male then fired a round towards her, striking the standing food warmer. A.J. stated that she immediately ducked down and hid underneath the stainless-steel table that she was working on for her safety. A.J. stated that she remained hidden under the table until she heard the suspects exit the business. A.J. stated that once the two males were outside, she heard approximately seven (7) more gunshots on the north side of the building. A.J. stated that she immediately called 911 following the incident.

15.     Officers searched the north side of the building and located (7) spent casings on the ground near the main entrance door on W. Vera Avenue.

16.     Officers spoke with D.L. regarding the incident. D.L. stated that he was making pizzas near the front counter when he heard gun shots. D.L. stated that he ran to the rear of the store to take cover.

17.     Officers also spoke with S.M. S.M. stated that he was putting pizzas into the pizza carrying bags when the incident occurred. S.M. stated that he heard someone near the front counter say, "Come here," and heard a single gunshot. S.M. stated that he immediately ran to the rear of the business and heard an additional (3) gunshots coming from the front of the store. S.M. stated that he ran outside and took cover behind a vehicle.

18.     Officers were able to view the Domino's Pizza security cameras and observed the incident. Officers observed the first suspect, hereinafter Suspect 1, to be a black male, approximately 5'6" with a Medium build. He was wearing a black coat with a white triangle on the left shoulder, blue jeans, gray underwear, and black shoes. Suspect 1 was wearing a mask that covered a majority of his face with the hood of his coat pulled

7

up. Suspect 1 also wore corrective glasses with a dark frame. Suspect 1 was armed with a black semi-automatic handgun with an extended magazine.

19. The second Suspect, hereinafter Suspect 2, was a black male, approximately 5′10″, medium build, wearing a black coat, black jeans, and black shoes. Suspect 2 also wore a white surgical mask and was armed with a black semi-automatic handgun with a green lower receiver and grip. Both suspects were wearing rubber or latex gloves during the time of this incident.

20. During the review of the surveillance video, officers observed Suspect 1 point his firearm at A.J. and moments later, fired a single shot which struck the standing food warmer. Suspect 2 then reached his firearm around a column in the lobby and blindly fired (4) rounds into the kitchen area. The two suspects then exit the business through the main entrance door. Suspect 1 stopped briefly in the doorway and turned around, pointing his weapon towards the front counter area. It appeared that Suspect 1 attempted to fire his weapon again, but the gun would not discharge. Both suspects exit the building and walk to the north side of the building. A gray 2008-2012 Chevrolet Malibu with a large dent on the rear passenger side door was then observed driving west on West Vera Avenue, then south on North Teutonia Avenue. Prior to entering the suspect vehicle, one of the suspects appeared to have observed two victims, D.L. and S.M., run away from the restaurant eastbound on West Vera Avenue, so they fired (7) gunshots in their direction. Neither D.L. nor S.M. were struck by the gunfire.

21. Surveillance video was also recovered from 6930 North Teutonia Avenue (Express Wireless & Tobacco) which was located just north of the Domino's Pizza. Upon

review of the video, Officers observed the gray Chevrolet Malibu traveling east on West Vera Avenue and travel out of sight. The vehicle then came back into view, traveling west and parked along the north side of the Domino's building. Suspects 1 and 2 are observed exiting the vehicle, one from the driver's side and one from the passenger side of the vehicle. Both suspects are then observed entering the Domino's Pizza. Shortly thereafter, both suspects quickly exit the Domino's and one of the suspects was observed discharging his firearm multiple times (muzzle flashes are observed). Both suspects reenter the suspect vehicle, one entering the passenger side of the vehicle and one entering the driver's side of the vehicle. The suspect vehicle was then observed fleeing from the area, south on North Teutonia Avenue.

22.    On December 16, 2022, at 3:08 a.m., MPD Officers observed a black 2009 Chevrolet Malibu, with WI plate ARE-7662, with heavy damage to the rear passenger door, parked next to a gas pump at a gas station located at 1545 W. Hopkins Avenue.



23.    The Officers were aware of the vehicle's connection to the armed robbery that had occurred on December 14, 2022. Upon entering the gas station lot, Officers observed the occupants of the vehicle inside the convenience store associated with the

9

gas station. Officers observed a black Glock handgun inside the vehicle, in plain view, on the center foldable arm rest inside the suspect vehicle. The firearm had a large clear extended magazine containing gold unfired cartridges.



24.     As the first occupant of the vehicle exited the gas station and approached the suspect vehicle, Officers approached and identified the suspect as BRANTLEY. Officers asked BRANTLEY if he had a CCW permit, if he was a felon, and if the firearm inside the vehicle belonged to him. BRANTLEY told Officers that he did not have a CCW permit. BRANTLEY also stated that the firearm did belong to him but that he was not a felon. A record check of BRANTLEY revealed that he was indeed a convicted felon and was not authorized to be in possession of a firearm. Officers took BRANTLEY into custody at this time.  The second occupant of the vehicle, identified as DORREUS N.

EALY (dob: XX/XX/1986), then exited the gas station convenience store. EALY, who did not have a CCW permit, was placed into custody regarding the concealed handgun inside the suspect vehicle.

25.     After being handcuffed and placed in the back of a Milwaukee Police Department squad car, Brantley made a series of statements that were not in response to questions including that he did not wish to go back to prison, so police could keep the gun that was in his vehicle.

26.     In addition to the loaded black Glock 17 Gen 5, bearing SN: BWFN803, firearm with a clear extended magazine (loaded with (40) 9mm rounds in the magazine and (1) unfired cartridge within the chamber), a search of the suspect vehicle identified (1) green latex glove, (2) blue latex gloves, (2) purple/blue latex gloves, (1) black iPhone with silver back, (1) red iPhone with a cracked screen and a rainbow case, (1) black ski mask with large single eye hole, (1) black (31) round capacity extended magazine, (1) black Adidas nylon bag that contained an additional Glock-styled magazine loaded with (17) 9mm unfired cartridges, and a small box of ammunition containing (6) 9mm unfired cartridges.

27.     Also taken into custody, was the black jacket that BRANTLEY was wearing bearing a white triangle logo on the left shoulder that Suspect 1 can be observed wearing in surveillance video of the incident.

28.     Brantley was Mirandized and interviewed in custody on December 16, 2022. Brantley stated that he knew he had been convicted of a felony. In the midst of denying he had ever had the gun from the car "on him," Brantley stated, "I found [the

11

gun]," and when asked where he found it in the car, he said, "No, I didn't find it in the car, I found it on the street somewhere." He said the Chevy Malibu was his car (though he described it as "the Impala"). Brantley then said, "that don't mean I shot the gun." When asked if he took possession of the gun by taking it off the street he replied, "yeah I found it." And when again asked, "so you took possession of it," Brantley replied, "yeah, I wasn't going to do nothing with it."

29. The detective interviewing Brantley then transitioned to what he introduced as "the Quad graphics incident" – *i.e.*, the 11/7/22 shooting by Brantley at his brother - and Brantley asked, "The situation at the gas station?" When told "yes," Brantley said, "That wasn't me." During this point of the interview, the interviewing detective had not brought up the details or the location of this incident. Brantley had not been arrested or previously questioned regarding this incident, yet Brantley knew the [Quad] incident took place at a gas station.

30. I know that on July 10, 2017, BRANTLEY pled guilty to federal charges of Title 18 U.S.C. § 1951(a) unlawfully attempting to obstruct, delay, and affect commerce by attempted robbery, and Title 18 U.S.C. § 924(c)(1)(A)(ii), knowingly possessing and brandishing a firearm in furtherance of a crime of violence. I also know that BRANTLEY was sentenced on October 19, 2017 to 84 months in prison and two years of supervised release.

31. On October 7, 2022, BRANTLEY was released from federal custody and was under federal supervision during the time this incident occurred. As part of BRANTLEY's conditions of his supervised release and due to BRANTLEY's prior felony

conviction for which he served more than one year in the custody in the Federal Bureau of Prisons, BRANTLEY is prohibited from possessing firearms. *See United States v. Devon Brantley*, Case No. 16 CR 188 (E.D. Wis.).

32.     Following the recovery of the firearm from BRANTLEY on December 16, 2022, the firearm was test fired by a Forensic Technology Certified IBIS Technician and it was determined that casings recovered from the incident that occurred on November 7, 2022, the incident that occurred on November 30, 2022, and the incident that occurred on December 14, 2022, were fired by the same firearm. More specifically, all of the casings recovered on November 7, 2022, all of the casings recovered on the incident that occurred on November 30, 2022, and (1) of the casings recovered on December 14, 2022 were fired from the handgun seized from BRANTLEY's vehicle.

33.     On March 6, 2023, your affiant contacted United States Federal Probation Officer Daniel Zander. Zander stated that on November 22, 2022, Zander last had contact with BRANTLEY over text while BRANTLEY was using cellular telephone number **414-574-6830** (**Target Phone #1**). Zander stated that during their text message conversation, BRANTLEY identified himself in the text message to Zander as they discussed things related to BRANTLEY's probation. Zander also stated that in October of 2022, Zander also was contacted by BRANTLEY using the cellular telephone number **414-797-9975** (**Target Phone #2**). Zander spoke with Brantley on the phone and also received a text message from BRANTLEY from that phone number where BRANTLEY identified himself. Your affiant is requesting the following information based on the information

13

provided and the association with BRANTLEY to the Hobbs Act robbery and firearms violations that took place.

34. Your affiant is requesting the subscriber information, call detail records, cloud storage records for Target Phone #1 and Target Phone #2 for the timeframe of November 1, 2022, at 12:00 a.m. (CST) through December 16, 2022 at 11:59 p.m. (CST).

## CELL SITE DATA

31. In my training and experience, I have learned that the Service Provider is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

32. Based on my training and experience, I know Service Providers can collect cell-site data about **Target Phone #1 and Target Phone #2**. I also know that wireless

14

providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular phone to which they provide service in their normal course of business in order to use this information for various business-related purposes.

33.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **Target Cell Phone #1** and **Target Phone #2** user or users and may assist in the identification of co-conspirators and/or victims.

## V.     AUTHORIZATION REQUEST

34.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

35.     I further request that the Court direct Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it,

15

reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

# ATTACHMENT A

## Property to Be Searched

Records and information associated with the cellular telephone assigned call number **414-574-6830** and the cellular telephone assigned call number **414-797-9975** (referred to in attachment B as "the Accounts"), that is stored at the premises controlled by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Accounts listed in Attachment A for the following dates: November 1, 2022, at 12:00 a.m. (CST) through December 16, 2022 at 11:59 p.m. (CST):

    A.    The following information about the customers or subscribers of the Accounts:

        1.    Names (including subscriber names, user names, and screen names);

        2.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        3.    Local and long-distance telephone connection records;

        4.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        5.    Length of service (including start date) and types of service utilized;

        6.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity

18

Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

7.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

8.    Means and source of payment for such service (including any credit card or bank account number) and billing records.

B.    All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Accounts, including:

1.    the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

2.    information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received, as well as per-call measurement data.

3.    per call measurement and timing advance data (PCMD, RTT, True Call, NELOS, or similar)

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 18, United States Code and Sections 922(g)(1) (felon in possession of a firearm) and 1951(a) (Hobbs Act robbery), involving DEVON BRANTLEY, during the period of November 1, 2022, at 12:00 a.m. (CST) through December 16, 2022 at 11:59 p.m. (CST).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts

19

under government control) are authorized to review the records produced by the Service

Provider to locate the things particularly described in this Warrant.